Opinion delivered May 12, 1886.

[No. 3967.]

## H. W. NEIDERLUCK *alias* WILLIAM MILLER v. THE STATE.

1. VARIANCE—IDEM SONANS.—The indictment alleges the name of the injured party as E. S. Woods. The proof establishes the name to be E. S. Wood. *Held*, that "Wood" and "Woods" are neither the same name nor *idem sonans*, and that the variance is fatal.
2. EVIDENCE.—CONFESSIONS made in custody, whether the custody is for the charge on trial or for another and distinct charge, are inadmissible against an accused, unless he was duly cautioned as the law directs, or his statements, found to be true, conduced to establish his guilt of the crime imputed to him.

APPEAL from the District Court of Bexar. Tried below before the Hon. George H. Noonan.

The conviction in this case was had upon an indictment which charged the appellant with the theft of twenty-five hundred dollars in money, the property of E. S. Woods, in Bexar county, Texas, on the nineteenth day of January, 1885. A term of two years in the penitentiary was assessed against the appellant as punishment.

E. S. Wood was the first witness for the State. He testified that in January, 1885, he was doing business on the Main plaza, San Antonio, Texas. Witness knew the defendant as William Miller, until the day of this trial, when he suggested the name of Neiderluck. He also knew Thomas Taylor and F. G. Nichols, who now calls himself Barlow. Taylor was in the employ of the witness on January 19, 1885. His duties were to sleep at and watch the witness's place of business at night. Defendant and Nichols were not in the employ of the witness, but for a week prior to the night of January 19, 1885, had, with witness's

consent, been sleeping at witness's said place of business, with Taylor. The witness's said place of business was robbed on the night of January 18, 1885, or on the morning of January 19, 1885. The witness was last at his place of business before the robbery, about eleven o'clock on the morning of January 18, 1885, when Taylor and Nichols were both there, and everything in its right place. The room robbed was located over the old Plaza house, which is situated on the north side of the Main plaza. The main entrance to the up stairs premises was by a stairway from the plaza. Witness's premises consisted of three rooms, running back about one hundred feet. The rooms were divided by two lumber partitions, access from one to the other being had by means of doors cut in the center of each partition. The front and center rooms were about forty by twenty feet in size, and the rear room was about twenty by fifteen feet. The iron Herring safe, which was broken in to and robbed, stood in the south east corner of the front room. The cot on which Taylor slept stood near the side of the safe. Defendant and Nichols slept on two of the several baize covered tables that stood about the room. Taylor's cot was on a direct line with the safe and the door leading into the middle room. A gallery run the entire length of the three rooms, and access was had to them from the gallery. Two doors led from the front room to the gallery, one of which was nailed up. There were three doors from the middle room to the gallery, all of which were kept shut and fastened. Access to the middle room was had by means of the two inside doors. A narrow stair way at the rear end of the gallery led to the back yard, thence to an alley which passed the rear of the White Elephant saloon, and out on Acequia street. The back room described by the witness was used by him as a rubbish room. That room contained a table covered with green repp or baize, and a quantity of bed cord rope. The door which led into that room from the gallery was a double door, and was fastened on the inside, with bolts at the top and bottom, and a lock and key. That door was about eight feet high, with a transom of glass panes about ten by twelve inches in size. There was an old fracture of one of the transom panes large enough to admit a man's arm. There was no ladder or other object on the out side by which the transom could be reached. Taylor, who had the keys of the house, had orders to close and securely lock all of the doors at night, and he told witness, on the morning after the robbery, in the presence of Miller, that he locked and

fastened all of the doors before he went to bed on the night of the robbery.

Witness was first advised of the robbery about five o'clock in the morning of January 19, 1885, by Taylor and defendant, who came to his house. They said to witness: "There is a bad wind fall; six men came in, tied and gagged us, broke into the safe, and took all the money." Witness asked them how they got loose, and defendant replied that, as soon as the robbers left, he released himself and then released the others. Witness went with Taylor and defendant to the rooms, and was shown three gags made from Taylor's shirt, and three others made with pieces of green repp torn from the table which stood in the back room. Taylor, defendant, and Nichols, each stated to witness at this time that they locked all of the doors securely before they went to bed, and that the lights were all out when the robbers came in. One of the parties told witness that the robbers wore white masks, and afterwards another told him that they wore black masks. Taylor told witness that a party of friends played whist with him until about half past twelve o'clock and left; that Nichols then laid down; that he laid down about one o'clock, and that defendant came in a few minutes later, and went to bed. He said that they were first gagged with the green repp, but that those gags proving so severe the robbers tore up his, Taylor's, shirt, and made gags which they used. He said that they were tied and gagged for at least two hours. Witness made a close examination of the gags as soon as he got to the house, and found them almost perfectly dry. None of them were wet through two thicknesses of the cloth. One of the gags was stained with tobacco juice. That gag, defendant said, was the gag used on him, and that he was chewing tobacco when the robbers broke into the house. He had just before told witness that he was asleep when the robbers got in. When defendant and Taylor reached witness's house defendant showed witness one of his wrists, around which he said the cord had been tied. His wrists looked a little red, but more like it had been rubbed with the hand than like it had been tied with a cord or rope. Witness then looked at the other wrist, but it showed no redness or mark whatever. They showed the witness the cords with which they said they were tied. Those cords were unraveled strands of bed cord, similar to that which was in the back room.

Defendant told witness that while the robbers were operating on the safe he (being then gagged) tried to draw them into con-

versation by saying to them: "I would like to stand in with you in this job." He said that Nichols called to the robbers: "Hurry up; I am freezing to death." Defendant, Taylor, and Nichols, each said that the robbers came in at the back room from the gallery. Taylor said that he heard a noise in the back room, but thought it was made by rats; that, when the robbers got to the door leading into the front room, he got up, and was covered by the robbers' pistols; that they passed him at the door, tied, blind folded, and gagged the other two, and himself last; that the robbers then kept them in bed, with one man to guard them, while the others went through the safe; that they moved the safe from the front to the middle room, where they broke into it, and that they left the premises, as they came, through the rear room and back door, and thence down the back stairs. All of these statements were made by the different parties in the presence of each other. When witness reached his premises on the morning after the robbery he found that the safe had been moved from the front to the middle room, a distance of over fifty feet; that it had been broken into and denuded of its contents. Taylor's cot, in the front room, and the tables in the front room, stood in their usual places. The safe could not have been moved without moving Taylor's cot, in which he said he was sleeping when the robbers entered.

The witness asked Taylor how the robbers could have got into the house, if, as he said, all of the doors were locked. He replied that they must have sprung the bolts of the back door through the fractured transom. When sufficiently light, witness examined the back door and transom. He found that the dust which had accumulated to the depth of a quarter of an inch on the transom and the door had not been disturbed in the least. The dust on the edges of the broken glass was undisturbed. It was a physical impossibility for any one to insert an arm through the broken transom, and spring the bolts without disturbing the dust. The lock and bolts on the rear door, through which it was alleged the robbers got, were perfectly intact and unharmed. There was no mark or sign of violence on any of them, nor upon the inside or outside of the door. This back door was open when witness arrived, but witness was instantly convinced that it was opened from the inside, as there was not the slightest evidence about it of force having been applied from the outside. No force appeared to have been used on the inside doors or their fastenings. The parties named, defendant, Taylor, and Nichols, told

witness that the hands of the two latter were tied behind them, but that, one of defendant's hands being crippled, his were tied in front of him; that defendant got loose about twenty minutes after the robbers left, by working a knife out of his pocket and cutting the strings. Witness could see no reason why, if defendant was tied as he and Taylor and Nichols claimed that he was, he did not pull the gag out of his mouth at first.

The safe contained, and was robbed of, about four thousand two hundred dollars, in silver and currency, of which amount one thousand eight hundred dollars in currency, and five hundred dollars in specie, was the individual personal property of the witness. The balance belonged to Cliff Cook, Poley Reed, Sam Moore, and Billy Sims. Witness's money was his alone, and was not the joint property of himself and Reed and Sims, or any body else. Each of the other persons named in this connection had separate money in the safe. Witness was holding possession of all the money in the safe, and it was taken from his possession without his knowledge or consent. The safe was an iron combination lock structure, and would weigh from one thousand eight hundred to two thousand pounds. Two holes were bored under the lock. Filings on the carpet in the front room indicated that the safe stood in the front room when the holes were bored. No filings were found in the middle room. Cliff Cook, Bones Culmore, and witness, all of whom were in town on the night of the robbery, had the safe combination. It was Bones Culmore's business to open the house and start business in the mornings. To enable him to do so, the sum of three hundred dollars was always left out of the inside vault of the safe. Witness alone had a key to the inside vault. A screw head on the inside of the door was found broken. It could have been broken by being struck with a sledge hammer, after the door of the safe was opened. There was a sky light in the roof of the middle room. That sky light was shaped like a small belfry, and had two windows on each side. A cord and pulley was attached to all of the lower windows. The windows of the sky light were opened by pulling on the cord. It was the duty of the colored porter, Burke, to open and close the sky light.

T. J. Hughes testified, for the State, that he was a detective by profession, and in January, 1885, pursued his avocation in the city of San Antonio. Witness was called upon early on the morning of January 19, 1885, by E. S. Wood, to investigate the circumstances of the robbery of his place of business on the

preceding night. Witness reached the scene of the robbery a little after day light, and found Colonel Wood, Cliff Cook, Billy Sims, defendant, Taylor, and Nichols on the premises. He immediately questioned Taylor about the opening of the safe. Taylor said that he knew nothing about it, more than that he heard a noise, went to the door leading to the middle room, when some men entered. Witness and Sims then went to the Sun set depot, and telephoned to police head quarters to have defendant, Taylor, and Nichols arrested as vagrants, which was done, the recorder subsequently sentencing them to thirty days confinement. When the witness visited police head quarters on that morning, he had a conversation with defendant, Taylor, and Nichols. They were then under arrest upon a charge of vagrancy, but no charge of complicity in this robbery had yet been made against them. In that conversation Taylor said that the robbery was perpetrated by four men, who gagged him and his companions with gags made of strips torn from his, Taylor's, shirt. He said that the robbers entered and went out at the back door. Witness examined the gags on the morning after the robbery. He found them comparatively dry, and not wet through two thicknesses of the cloth. He saw also some unraveled bed cord, with which the parties said they were tied. Taylor's wrists showed no signs of having been tied. Witness knew from experience that if Taylor and his associates had been tied by their wrists, taut enough to hold them for two hours, as they claimed, the marks would have been plain on their wrists for a long time after witness examined them. Witness had tied, bucked, and gagged many men in the old army, and knew what he was talking about.

Witness made a careful examination of the premises on the morning after the robbery. The rear door was open, but it was evident that it was not opened from the outside. It was impossible for a man to get through the transom. But one of the panes of glass in the transom was broken, and that fracture was an old one, as shown by the dust which covered the edges of the broken glass to the depth of an eighth of an inch. Witness looked carefully, but could find no fragments or splinters of glass about the door. The glass could not have been broken during the night, in an effort to force the door, without scattering fragments over the floor, and an effort to force the bolts of the door by thrusting the hand through the broken pane would inevitably have left traces on the dust. Careful examina-

tion showed that no outside force had been applied to any of the doors. Witness had gagged a great many men in his time, and knew from observation and experience that a gag could not remain in a man's mouth for two hours without becoming thoroughly saturated with saliva and spittle, and the mouth of a man gagged for two hours will look very much swollen and red for a long time after the removal of the gag. None of the gags claimed to have been used in this instance had the least appearance of having been used, in fact, and the mouth of neither the defendant, Taylor, or Nichols, indicated a recent gagging. Witness found the sledge hammer, wooden wedge, and brace chisel in evidence near the safe, into which two holes had been drilled. Taylor told witness that he thought the robber who held the lantern was Cliff Cook, and that the man who tied him was Harry Thornton. The State rested.

J. D. Baxter was the first witness for the defense. He testified that he was a merchant policeman, in the city of San Antonio, on and for some time prior to January 19, 1885. Early on the morning of the day mentioned, the defendant came to witness and told him that he wanted to show witness something. Witness went with him to 307½ Main plaza, and was shown a safe which had been broken open, and some ropes and gags. Witness remained but a moment in the room. He told defendant that he would have to get a regular policeman, as he, witness, could not leave his beat.

Cross-examined, witness said that the defendant told him the robbers had been gone about twenty minutes when he applied to witness. Witness was standing at the corner of the Main plaza, about a block from No. 307½, when the defendant accosted him. Several policemen were standing about on the plaza and on that block. Witness met officer Krueger and another officer a few minutes before he encountered the defendant. The police on the Main plaza, or at the White Elephant saloon, or at the Revolving Light saloon, which kept open all night, could have easily heard a person working on the gallery doors or windows in front of No. 307½ Main plaza.

Andreas Brown testified, for the defense, that Taylor came to police head quarters about four o'clock, a. m., on January 19, 1885; and got witness to go with him to Wood's premises. Witness, on his arrival, saw that Wood's safe had been robbed. On his cross-examination, witness stated that the White Elephant and Revolving Light saloons, on the Main plaza, and near the robbed

premises, kept open all night.   Police were stationed on the plaza all night.   A person calling from the up stair gallery in front of Wood's rooms would easily be heard by the police at the Revolving Light or White Elephant saloons.

Clem Bee testified, for the defense, that he had recently visited the premises of Wood, at the request of defendant's counsel. The middle room sky light worked with a rope and pulley. Witness did not think that the rope would sustain the weight of a man.   Mr. Griffin tried, but failed to spring the bolt in the back door, through what looked like a small cat hole.   Defense closed.

James Burke, porter at No. 307½ Main plaza, testified, for the State, that the sky light in the middle room contained eight windows.   When witness left the place, on the night of January 18, 1885, he tied one of the ropes to a window sash.   When he returned to work, on the next day, he found the rope tied as he left it, and the sky light closed, just as he left it.   Neither the rope, the pulley, nor the sash would bear the weight of a man descending from the sky light.

The motion for a new trial raised the question discussed in the opinion.

*Gerald Griffin*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE.   Appellant was convicted of theft of money, the property of E. S. *Woods*.   The indictment alleges that the money was taken from the possession of, and belonged to E. S. *Woods*.   The proof shows that it was the property of E. S. *Wood*.  Is this a variance?  Are the names "Wood" and "Woods" *idem sonans?*

In Parchman v. The State, 2 Texas Court of Appeals, 228, it is held that "Frank" and "Franks" are neither the same name nor *idem sonans*.   "Thompsons" and "Thompson," and "Richards" and "Richard" are held not to be *idem sonans*.   See also examples given by Mr. Wharton in the first volume, section 57, of his work on Criminal Law.

Under the authorities, "Woods" and "Wood" are not *idem sonans*, and hence there is a variance.   There is no proof that Woods was called Wood.

Appellant and some others were suspected, but not arrested

for some weeks after the theft. But soon after the theft they were arrested and placed in jail together. The State, over objection of defendant, introduced in evidence statements made by the parties, they being in jail together, charged as vagrants. The statements of each, made in the presence of defendant, were admissible, though the conspiracy was at an end; but it is insisted that the defendant was in jail, and as he was not cautioned, as the law directs, his statements were inadmissible.

The question presented is this: Must the defendant be in custody—in jail—for the offense then being tried, in order to make his confession inadmissible as evidence? We think not. (Art. 750, Code Crim. Proc.; Grosse v. The State, 11 Texas Ct. App., 364; Davis v. The State, 19 Texas Ct. App., 202.) The code does not require that the defendant shall be in jail for the offense *then being tried,* in order to render his confession incompetent. We are of the opinion that the statement made by defendant while in jail, he not being then cautioned, as the law directs, nor having made statements found to be true, etc., were not admissible, although he was imprisoned, not for this offense, but for vagrancy.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*